UNITED STATESDISTRICT COURT
DISTRICT OF MASSACHUSETTS


**Civil Action No: 05-10448-GAO**


_____

JOANNE M. ROYER.                              )
                                              )
        Plaintiff,                            )
                                              )
        V.                                    )
                                              )
BLUE CROSS BLUE SHIELD                        )
OF MASSACHUSETTS, INC., BLUE                  )
CROSS BLUE SHIELD OF                          )
MASSACHUSETTS INC. OMNIBUS                    )
WELFARE BENEFIT PLAN and BLUE                 )
CROSS BLUE SHIELD LONG TERM                   )
DISABILITY BENEFIT PLAN,                      )
                                              )
        Defendants.                           )
                                              )
_____)

**PLAINTIFF'S RESPONSE TO THE DEFENDANT'S OPPOSITION TO
THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**


The Plaintiff, in the above short and long term disability claim in response to the
Defendants' Opposition to her Motion For Summary Judgment says that the Defendants
have and will go to any extreme to deprive the Plaintiff of the short and long term
disability benefits to which she is and should be declared entitled.

By their Opposition, the Defendants say in part, that the Plaintiff filed her Motion For
Summary Judgment too soon, even though in the scheduling order there appeared to be
no earliest date established for the filing of this Motion for the long overdue relief which
the Plaintiff has been denied for 3 years since March 28, 2003.

-2-

By filing this Plaintiff's Motion earlier than the due date, the Defendants have not been prejudiced in any way and in fact have been able to use the opportunity to silence the Plaintiff and to further punish the Plaintiff for an earlier rather than a later filing of her Motion for prompt Summary Judgment relief.

The Defendants make no reference to a misunderstanding as to a hearing date on other motions raised by them which at that time and given the state of electronic wizardry including but not limited to electronic court filings, cell telephones, facsimile transmissions and the regular telephone lines, could have avoided the situation which occurred on January 19, 2006, wherein certain motions made by the Defendants were heard and decided on the record.

Plaintiff's Motion For Summary Judgment was filed as of that date, January 19, 2006, to ensure timely compliance with what was understood then to be the proper time line for such filing.

Also, the Plaintiff has not in any way caused any shortening of the court's timetable for the Defendants' to respond to her Motion For Summary Judgment.

In addition to the Defendants' complaining about the Plaintiff's having filed her Motion For Summary Judgment earlier as opposed to later, they allege that a brief statement of facts in support of her Motion For Summary Judgment is too brief and therefore does not meet the requirements of Local Rule 56.1 and Local Rule 7.1. As for Local Rule 7.1, it was part of the scheduled proceedings for such motions to be filed by all parties and that should be undisputed. As to not meeting the requirements of Local Rule 56.1, the attachments to the Motion incorporated therein by reference should satisfy this court that the spirit, letter and intent of Rule 56.1 has been amply satisfied.

A reading of the Motion and its attachments should make it clear to this court that the primary issues being addressed in the Motion are for the prompt award of the balance of

-3-

the short term disability benefits which the Plaintiff says she is owed from March 22-28, 2003, as calculated and determined in her Complaint, as well as the long term disability benefits she is also owed from July 1, 2003, to the present, and for the foreseeable future until she is no longer disabled or alive, or until she has attained age 65 years, which ever shall first occur.

As to her short term disability benefits, it is clear from her complaint Count One , page 8., that she is still owed $6,682.00. in additional short term disability benefits to July 1, 2003, and that based upon Count Two of her Complaint, p.8-9.,  she is owed an additional sum of $39, 672.00 for long term disability benefits from July 1, 2003 to the date of filing of her Complaint on June 24, 2005; and $1,653 per month thereafter until as aforesaid she is no longer disabled, she is no longer alive or until she has attained 65 years of age, whichever shall have first occurred.

It was clear at the time of the hearing in court prior to January 19, 2006, that if she prevailed on Counts One and/or Two, she could then be entitled to interest, legal fees and costs as originally set forth in Count Four of her Complaint, p.9-10.

If the Defendants' and/or either of them disagree with the amounts, or the fact of entitlement, they have the opportunity if they so choose, to correct the amounts she would be entitled to, if she prevails in her claims for short term and long term disability benefits.

Therefore, none of the foregoing should be a basis for a direct Opposition to the Plaintiff's Motion for Summary Judgment, especially inasmuch as the Defendants may have alternate relief as well, if they deem it worthy of pursuit.

Any statement of fact not specifically set forth in the Plaintiff's Motion For Summary Judgment is in any event is supported by  an administrative record which is intended to enable this court to perform a variety of levels of judicial review, even though the

-4-

administrative record presented was created, maintained and updated, not by an impartial tribunal, but by the primary Defendants named herein.

The Plaintiff's Motion For Summary Judgment should not and need not be rejected or denied on any procedural grounds inasmuch as the combination of the administrative record, the Plaintiff's Motion For Summary Judgment and the complaint make it clear that the Defendant Blue Cross Blue Shield, Inc., the employer, is directly obligated to pay any and all remaining short-term disability benefits to which the Plaintiff is still owed i.e. from March 28, 2003 to July 1, 2003.

In addition and on these same bases, the Blue Cross Blue Shield of Massachusetts, Inc. Omnibus Welfare Benefit Plan and Long term Disability Plan are obligated (through its insurer/administrator, Lumberman's formerly Kemper, a/k/a Broadspire), for the direct payment of the Plaintiff's long term disability benefits from July 1, 2003 to the present, and for the foreseeable future.

As a further result, there exists and has been an ongoing and significant conflict of interest which requires this court to provide this Plaintiff with a more lenient and more favorable review than she might be entitled to under the "arbitrary and capricious standard," and/or the "unreasonable standard," such as occurred in this case when the Defendants refused an opportunity to have an IME of their own choosing personally interview and examine this Plaintiff.

This failure to have the Plaintiff examined by an IME and to rely solely upon the "book-report," reporting of Sheldon Meyerson. MD who when the surgeon was not available insisted upon speaking to the secretary of the surgeon and asked her to review the surgeon's notes so that he could use her interpretation of those notes as a basis for raising the standard for approval of short term disability benefits. Then, after unilaterally raising the standard, without any justification or change in language in the short term disability

-5-

plan, he did willfully and deliberately use that secretary's lack of information to advise the Defendants that he could determine no basis for continuing the short term disability benefits of the Plaintiff.. This conduct has been determined to be improper and reversible error pursuant to the recent 2005 decision of *Buffonge v. Prudential Insurance CO. of America, 426 F.3d 20 (1st Cir. 2005).*

Conduct such as this has also been the basis for the insurance regulatory agencies i.e. 48 states imposing a 15 Million ($15,000,000.00) Dollar fine on UNUM a/k/a UNUMProvident and the State of California and New Mexico imposing an Eight Million ($8,000,000.00) Dollar fine upon UNUM a/k/a UNUMProvident.

A copy of that news release is attached hereto, made apart hereof and marked, "A."

A copy of the Plaintiff's ongoing total disability report from her primary care physician covering the period of January 2003, to the present, is attached hereto, made a part hereof and marked , "B."

In addition, and in further support of the Plaintiff's position and her Motion For Summary Judgment, as well as her entitlement to a more lenient judicial review, see *Quinn v. Blue Cross Blue Shield Ass'n 161 F.3d 472, 475 (7th Cir. 1998)*

## CONCLUSION

Based upon the foregoing, the Defendants should not be entitled to any relief sought in their Opposition inasmuch as the Plaintiff has timely filed her Motion For Summary Judgment, has amply supported it with reference to the Administrative Record as well as with clarification of facts sworn to by her, and would be entitled to do so, in any event, in her Opposition to the Defendants' Motion For Summary Judgment.

-6-

## REQUEST FOR ORAL ARGUMENT

Counsel for the Plaintiff requests the opportunity to argue this matter orally before the court and estimates that 15 minutes will be required for same.

Dated: April 17, 2006                    The Plaintiff By Her Attorney:


                                         s/ Bernard A. Kansky, Esq.
                                         BERNARD A. KANSKY, ESQ.
                                         MA BBO# 258040/ FED#28209
                                         KANSKY & ASSOCIATES
                                         468 COMMERCIAL ST #100
                                         BOSTON, MA 02109-1020
                                         (617) 227-2020/FAX (617) 227-5717


## CERTIFICATE OF SERVICE

I undersigned counsel for the Plaintiff do hereby certify that on the month, day and year set forth below, I caused a copy of same to be forwarded to opposing counsel of record by use of the electronic court filing system currently in effect.

Dated April 17, 2006          _     s/Bernard A. Kansky, Esq.
                                    BERNARD A. KANSKY, ESQ. FOR THE
                                    PLAINTIFF.

Exhibits "A" and "B" to follow shortly

*Kansky & Associates*

ATTORNEYS AT LAW

BERNARD A. KANSKY, ESQ.

THE CONSTITUTION WHARF BUILDING
468 COMMERCIAL STREET

*Boston, Massachusetts 02109-1020*

(617) 227-2020    TELECOPIER (617) 227-5717

FILED
CLERKS OFFICE

2006 APR 18  P 3: 57

U.S. DISTRICT COURT
DISTRICT OF MASS.

April 18, 2006

Gina Edge, Docket Clerk
For: Judge George A. O'Toole
United States District Court
District of Massachusetts
**Suite # 4710**
John Joseph Moakley Court House
One Court House Way
Boston, MA 02210
(617) 748-9152/ Fax (617) 748-9096

Re: **Joanne M. Royer v. Blue Cross Blue Shield of Massachusetts, Inc. et als, Docket Number: 05-CV-10448-GAO,** ERISA Long Term Disability Case, 20 Plus Pages of Exhibits**, Marked "A," and "B,"** Referred To In Plaintiff's Response To The Defendants' (45-1) (February 3, 2006) Opposition To The Plaintiff's (01/19/06) Motion For Summary Judgment, Which Plaintiff Response Was Filed Electronically i.e. ECF On April 17, 2006.

Dear Ms. Edge:

Please be advised that the Response of the Plaintiff to the Document (45-1) Opposition of the Defendants' to the Plaintiff's Motion For Summary Judgment (dated 01/19/06) was electronically filed on April 17, 2006, with an indication that the Exhibits "A" and "B" were to follow.

Inasmuch as Exhibits "A" and "B" combined total more than 20 pages, more or less, based upon the past suggestion of Virginia "Ginny," Hurley, the ECF Tutor/Instructor as recalled, these Exhibits are being forwarded by other than extensive electronic filing and are enclosed herewith and to be incorporated in the Response of the Plaintiff filed electronically as of April 17, 2006.

If any questions, please advise immediately upon receipt.

Please also be advised that a copy of this correspondence as well as a copy of the Exhibits have this day been forwarded to Opposing Counsel by postage prepaid first-class United States Mail.

If anything further is desired or required to satisfy and/or complete the within filing, please advise upon receipt or otherwise at your very earliest convenience.

-2-

Thank you very kindly.

Very truly yours,

BERNARD A. KANSKY
BAK:jt
Ebclosures

## · NEWS: 2005 PRESS RELEASE

For Release: October 3, 2005
Media Calls Only: 916-492-3566

### Insurance Commissioner John Garamendi Announces Major Settlement and $8 Million Fine Against UnumProvident Over Insurer's Handling of Disability Claims

Landmark agreement will change the way disability policies are handled in California

LOS ANGELES – Insurance Commissioner John Garamendi on Monday announced a landmark settlement with UnumProvident Corporation that will significantly improve consumer protection and profoundly impact how disability policies are handled in California – and possibly the nation.

The deal requires the nation's largest disability insurers, Unum Life, Provident Life & Accident, and Paul Revere, to pay an $8 million fine, the largest levied in the Department's history. The agreement settles a dispute over thousands of claims by California policyholders who were unfairly denied benefits. UnumProvident will change its policy language and claims handling procedures in dealing with those disputed claims, and all future claims.

Declaring that all disability insurers doing business in California will eventually be required to adhere to the standards set in the UnumProvident agreement, Commissioner Garamendi announced the settlement at the Glendale Adventist Medical Center's Therapy and Wellness Center near Los Angeles.

"This is a new day for policyholders whose disability insurance claims have been wrongly denied by insurance companies," said the Commissioner. "I am making it clear today that policies sold in California will deliver what they promise. In this state, insurers will live up to their end of the bargain."

The case stems from an exhaustive Department investigation begun in 2003 into allegations of unfair claims settlement practices by the Tennessee-based UnumProvident. The investigation uncovered more than 25 business practices that violated California law, including:

• Knowingly applying the wrong definition of "total disability" in claims handling;

• Selectively and inappropriately using independent medical exams and other medical information to the company's own advantage;

• Mischaracterizing certain non-sedentary nursing occupations as sedentary, which required policyholders to find sedentary nursing work instead of receiving the disability benefits to which they were entitled

Last year, UnumProvident signed a settlement with 48 other states over some of the same practices, in addition to paying a fine of $15 million. Commissioner Garamendi declined to sign that agreement, working instead to seek further consumer protections consistent with California law.

The Commissioner noted that many of the provisions of this agreement will eventually apply to all other disability insurers operating in the California market. "Today's action goes beyond UnumProvident," he said. "California's disability insurers now have a new standard, one that will provide a better sense of security for policyholders, which is what disability insurance is really all about."

To ensure that all insurers are in compliance with the standards set by the agreement, Commissioner Garamendi will soon commence a data call for purposes of reviewing all outstanding policies of other carriers writing disability insurance in California.

The terms of the agreement with UnumProvident will apply to California claimants who were denied benefits between January 1, 1997 and September 30, 2005. They are eligible to have their claims reassessed, and if necessary are entitled to a review of the reassessment by an independent expert.

Important aspects of the settlement include:

• California claimants who opted in under the multistate settlement will be reassessed under California settlement standards;

• A higher standard must be met for the insurer to reject a claimant's doctor's opinion on disability, and the reasons must be documented in claim files;

http://www.insurance.ca.gov/0400-news/0100-press-releases/0080-2005/release089-05.cfm    ·3/1/2006

**"A"**

: Claimants or their doctors may request an independent medical examination;

•·All other claims handling changes implemented in the multistate settlement are incorporated within the California settlement.

- Accusation
- California Settlement Agreement (CSA)
- Market Conduct Examination Report
- Decision and Order of Insurance Commissioner Upon Settlement [also Exhibit "A" to CSA]
- Exhibit "B" – Independent Review Process
- CSA Notice to California Claimants [also Exhibit "C" to CSA]
- Appendix – Table of Contents
- UnumProvident's Response to the Market Conduct Examination Report
- Multistate Regulatory Settlement Agreement

### Los Angeles Times: State Fines Insurer, Orders Reforms in Disability Cases

By Peter G. Gosselin
Times Staff Writer

October 3, 2005

California insurance regulators today will announce that they are fining the nation's largest disability insurer $8 million, requiring the company to reopen as many as 26,000 California cases and demanding that it alter the policies it sells in the state to include greater consumer protections.

The regulators said they intend to impose similar policy changes on all firms licensed to sell disability insurance in the state. Independent legal authorities said the changes will give disability claimants new rights to win court review in disputed cases, a precedent they said could spread to other kinds of insurance, such as healthcare coverage.

The action, which will come as a settlement with Chattanooga, Tenn.-based UnumProvident Corp., could substantially alter how insurance is regulated in California - and perhaps the nation as well if other regulators follow the state's precedent.

The action will be substantially stiffer than a settlement last fall between the company and regulators in 48 other states in which officials made no formal findings of wrongdoing but only identified "areas of concerns."

By contrast, California regulators will charge UnumProvident with more than 25 violations of state law, allegations that the company will neither admit nor deny in favor of settling the case.

Among the charges: that the company knowingly applied the wrong legal definition of disability in denying claims or ruling claimants were able to go back to work, targeted high-cost claims for denials to save the firm money, misused claimants' medical records and even the opinions of in-house medical personnel to deny benefits and wrongly sought to file cases under a federal benefits law that severely limits claimants' ability to successfully sue their insurers.

Regulators said they uncovered violations of state law in nearly one-third of a random sample of about 1,000 claims handled by UnumProvident.

"UnumProvident is an outlaw company. It is a company that for years has operated in an illegal fashion," said California Insurance Commissioner John Garamendi. "Our settlement is designed to make it a poster child of a legal company."

Garamendi is scheduled to announce his agency's settlement with the company at two news conferences in Los Angeles and San Francisco later today.

Reached Sunday, UnumProvident Chief Executive Thomas R. Watjen said he could not comment on California's allegations because details of the firm's settlement with the state were still being worked out. But Watjen suggested that the regulators' action is based on an outdated examination of company operations from 2000 through 2003.

"We've gone through an enormous amount of change in the past few years. Any review that was done a few years ago doesn't reflect the new UnumProvident," he said.

The changes include Watjen's replacement of longtime UnumProvident Chief Executive J. Harold Chandler in 2003.

News of California's tough action comes two months after a Los Angeles Times story detailed extensive problems at UnumProvident and other major disability insurers. The paper traced many of the problems to a series of court decisions concerning federal benefits law, which have blocked states from providing consumer protection for a wide array of employerprovided benefits including healthcare, and have limited claimants' right to sue.

Disability insurance is designed to replace half or more of a person's wages if they are incapacitated by illness or injury. More than 50 million Americans are covered, most through their employers. UnumProvident, with half the U.S. market, covers 25 million.

Under the firm's settlement with the state, UnumProvident policyholders in California whose claims were denied or whose benefits were terminated since Jan. 1, 1997, will be able to request that the company reassess their case with an eye to starting or resuming benefit payments.

But unlike a similar reassessment process set up by the 48-state settlement last fall, those dissatisfied with the company's review of their claims can appeal to an independent reviewer to be chosen jointly by the state Insurance Department and the company.

The settlement will require UnumProvident to change the language in all new — and some existing — California policies in several ways that favor consumers. For example, it will force the company to remove limitations on benefits for "self-reported" conditions such as migraine headaches and fatigue, which are impossible to measure objectively but can severely disable people.

It also will restrict the firm's use of a 24-month limitation on benefits for "mental and nervous conditions." UnumProvident repeatedly has been accused of wrongly categorizing claimants as suffering from such conditions, rather than physical ailments, to reduce what it must pay them.

The settlement will require the company to drop its court challenge to Garamendi's order outlawing so-called "discretionary authority" in policies. Discretionary authority language effectively makes the insurer the final arbiter of most disputes involving policies, and means that claimants' suing the firm have had to prove not simply that the company's decisions were wrong, but arbitrary and capricious — a difficult standard to meet.

State Insurance Department officials said they will call a meeting of other disability insurers for early November to discuss the new requirements, and will take regulatory action against those who refuse to adopt the policy changes.

"What we're saying to any company operating in this area of insurance," Garamendi said, "is it has to stop screwing its customers."

Additionally, the planned settlement "will undoubtedly bleed over into healthcare and give claimants a better chance to make their case for coverage," said Mark D. DeBofsky, a partner with the Chicago law firm of Daley, DeBofsky and Bryant.

### 

Please visit the Department of Insurance Web site at www.insurance.ca.gov. Non media inquiries should be directed to the Consumer Hotline at 800.927.HELP. Callers from out of state, please dial 213.897.8921. Telecommunications Devices for the Deaf (TDD), please dial 800.482.4833.

If you are a member of the public wishing information, please visit our Consumer Services.

## Bureau of Insurance

About the
Bureau

Consumer
Information

Insurance
Company
Information

Producer
Business Entity
Information

Laws, Rules,
Decisions

Hearing
Schedule

Frequently
Asked
Questions

Send Us
E-Mail

Links

Insurance
Home Page

## IN THE MATTER OF

## FIRST UNUM LIFE INSURANCE COMPANY
## New York, New York

## REGULATORY SETTLEMENT AGREEMENT

This Regulatory Settlement Agreement ("Agreement") is entered into as of this ___ day of November, 2004, by and between First Unum Life Insurance Company (the "Company"), the Superintendent of Insurance of the State of New York (the "Lead Regulator"), the Commissioner of the Tennessee Department of Commerce and Insurance, the Commissioner of the Massachusetts Division of Insurance and the Superintendent of the State of Maine Bureau of Insurance (collectively with the Lead Regulator, the "Lead Regulators"), and the United States Department of Labor (the "DOL").

### A. Recitals

1. The Company maintains its home office at New York, New York. At all relevant times, the Company has been a licensed insurance company domiciled in the State of New York. The Company and its affiliates Unum Life Insurance Company of America ("Unum"), The Paul Revere Life Insurance Company ("Revere"), Provident Life and Accident Insurance Company and Provident Life and Casualty Insurance Company ( collectively, "Provident") are subsidiaries of UnumProvident Corporation, a Delaware corporation, with its principal place of business in Chattanooga, Tennessee (the "Parent Company"). At all relevant times, Unum is and has been a licensed insurance company domiciled in the State of Maine, Revere is and has been a licensed insurance company domiciled in the Commonwealth of Massachusetts and Provident is and has been a licensed insurance company domiciled in the State of Tennessee. The Company, Unum, Revere and Provident are herein collectively referred to as the "UnumProvident Companies".

2. On September 2, 2003, the Lead Regulators of the domiciliary states of Unum, Revere and Provident Life and Accident Insurance Company, Maine, Massachusetts, and Tennessee called a multistate targeted market conduct examination of those companies (the "Multistate Examination") to determine if the individual and group long term disability income claim handling practices of those companies reflected systemic "unfair claim settlement practices" as defined in the National Association of Insurance Commissioners ("NAIC") *Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance Model Act (1972)* or *NAIC Claims Settlement Practices Model Act* (1990) (collectively, the "Model Act") pursuant to the procedures established by the *NAIC Market Conduct Examiner's Handbook* (the "Handbook").

3. The other forty-seven states, the District of Columbia and American Samoa chose to be "Participating States" in the Multistate Examination. Contemporaneously with the Multistate Examination, the DOL was conducting an investigation of the UnumProvident Companies (the "DOL Investigation") pursuant to Section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1134.

4. As a result of the Multistate Examination, the Lead Regulators engaged in discussions with the UnumProvident Companies with respect to regulatory concerns raised by the Multistate Examination, a plan of corrective action by the UnumProvident Companies to address those concerns for the benefit of their current and former policyholders and insureds, and a means of providing for the enforcement of such a plan. After extensive discussion, the UnumProvident Companies agreed to a plan of corrective action to be set forth in this Agreement and substantially identical regulatory settlement agreements between each of the three other insurance companies which come within the definition of UnumProvident Companies and their respective domiciliary regulators and to the payment of a $15,000,000 fine. As the result of the ongoing Multistate Examination and the DOL Investigation, the UnumProvident Companies, the DOL and the Lead Regulators decided to enter into a global settlement resolving common matters pertaining to the Multistate Examination and the DOL Investigation. (The UnumProvident Companies adjust the claims for each member insurer from common locations using common procedures. The issues identified by the Multistate Examination are therefore assumed to also be present for the Company.) An Examination Report concerning the Multistate Examination is being released concurrently with this Agreement that contemplates the execution of this Agreement.

5. The plan of corrective action addresses a number of regulatory and statutory concerns raised by the Lead Regulators and the DOL. It seeks to accomplish the following:

a. provide an effective Claim Reassessment Process for an identified class of claimants who seek review of the earlier decision using an experienced claim unit formed by the UnumProvident Companies solely for this purpose to (i) perform a de novo review of the claims using past and current information that is relevant to the claim decision and (ii) apply the improved claim handling procedures contemplated by this Agreement in order that this Claim Reassessment Process constitute a fair way in which to remedy deficiencies that may have affected the earlier claim decisions covered by this Agreement;

b. provide changes to claim procedures that will improve the claim handling process and benefit current and future policyholders and insureds by (i) reflecting regulatory standards in the area of market conduct for handling disability claims, (ii) addressing the UnumProvident Companies' commitment to claim handling procedures that promote the fair, objective and thorough treatment of claims and be indicative of best practices in the handling of individual and group long term disability claims, and (iii) complying with applicable state and federal laws and regulations; and

c. provide for oversight in order to ensure compliance or effect enforcement, which oversight and ongoing monitoring includes (i) additions to the governance structure of the Parent Company and (ii) review by the Lead Regulators and the DOL so that activities of the Company hereunder and reviews by staff or examiners of the Lead Regulators and the DOL will result in quarterly reporting on the results of the Claim Reassessment Process and generally on the handling of individual and group long term disability claims and appropriate follow-up to resolve questions or correct any potential non-compliance with policies or procedures.

6. This Agreement sets forth (i) the plan of corrective action, (ii) provisions concerning the enforcement of the UnumProvident Companies' compliance with the plan of corrective action, and (iii) other miscellaneous provisions of this Agreement.

7. Location of Definitions. Listed definitions are contained in this Agreement unless there is specific reference to the definition being in an Exhibit or Attachment to an Exhibit to this Agreement.

a. "Agreement" is defined in the preamble paragraph.

b. "AP" is defined in paragraph B.3.c.(i)

c. "Applicable Consent Order" is defined in paragraph C.5.c.

d. "Board of Directors" is defined in paragraph B.1.a.

e. "Claim Reassessment Process" is set forth in paragraph B.2.

f. "Claim Reassessment Unit" is defined in paragraph B.2.a.

g. "Company" is defined in paragraph A.1.

h. "DOL" is defined in the preamble paragraph.

i. "DOL Investigation" is defined in paragraph A.3.

j. "ERISA" is defined in paragraph A.3.

k. "FCE" is defined in paragraph B.3.c.(i)

l. "Governance Implementation Date" is defined in paragraph B.1.a.

m. "Group" is defined in paragraph B.3.j.

n. "Handbook" is defined in paragraph A.2.

o. "IME" is defined in paragraph B.3.c.(i)

p. "Implementation Date" is defined in paragraph B.2.a.

q. "Lead Regulator(s)" is defined in the preamble paragraph.

r. "Model Act" is defined in paragraph A.2.

s. "Multistate Examination" is defined in paragraph A.2.

t. "NAIC" is defined in paragraph A.2.

u. "Parent Company" is defined in paragraph A.1.

v. "Plan" is defined in the heading to paragraph B.

w. "Regulatory Compliance Committee" is defined in paragraph B.1.c.

x. "Requesting Claimant" is defined in paragraph B.2.b.

y. "Specified Claimant" is defined in paragraph B.2.b.

z. "UnumProvident Companies" is defined in the preamble.

## B. Plan of Corrective Action (the "Plan")

1. Changes in Corporate Governance

a. Expansion of Board of Directors. The Lead Regulators, and the Board of Directors of the Parent Company (the "Board of Directors") have agreed that additional members with specific experience and qualifications shall be added to the Board of Directors. (Prior to entering this Agreement the Board of Directors directed a search using an outside search firm to identify candidates with senior management experience in the insurance or financial services industries and on August 12, 2004 elected three new independent directors with such qualifications.) The Board of Directors shall be expanded by the addition of three other directors who shall be "independent" directors under current rules of the New York Stock Exchange. In the first instance, two directors will be added, each of whom will have significant insurance industry or insurance regulatory experience, and they will be approved by the Lead Regulators. The UnumProvident Companies shall provide the names of the two prospective new members of the Board of Directors to the Lead Regulators by November 19, 2004. If the two proposed new members are approved by the Lead Regulators prior to December 15, 2004, they will be elected by the Board of Directors no later than December 16, 2004. However, if either or both of the two proposed new members is disapproved, the Board of Directors will continue in good faith to search to identify to the Lead Regulators as promptly as reasonably practicable (but no later than 60 days from the date of such disapproval) one or two additional qualified candidates, as appropriate, to propose as members of the Board of Directors. Following their approval by the Lead Regulators, such person or persons shall be elected by the Board of Directors at its next regularly scheduled meeting. The date of the election of the second of the two new members to the Board of Directors will be the "Governance Implementation Date", unless the two new members approved by the Lead Regulators are elected to the Board of Directors prior to November 19, 2004, in which case the Governance Implementation Date will be December 16, 2004. In addition to the two directors described above, the Board of Directors undertakes that the next following person to be added to the Board of Directors as a result of the retirement, resignation, death or failure to stand for reelection of an existing director or to fill an existing or newly-created vacancy will be a person with significant insurance regulatory experience. In any event, a person with such qualifications will be proposed by the Board of Directors for board membership and such person's name shall be provided to the Lead Regulators no later than June 30, 2005. If the Lead Regulators approve the proposed new member, the person will be elected to the Board of Directors at the next regular meeting of the Board of Directors following approval. If the Lead Regulators disapprove the proposed new member, the Board of Directors will continue in good faith to search to identify as promptly as reasonably practicable (but no later than 60 days from the date of such disapproval) a person with such qualifications to propose as a member of the Board of Directors. Following the candidate's approval by the Lead Regulators, the person will be elected to the Board of Directors at its next regularly scheduled meeting. If any of the new directors ceases to serve as a director prior to the end of the term of this

Agreement, the process described in this paragraph shall be applied to the selection of any replacement.

b. <u>Audit Committee</u>. No later than the Governance Implementation Date, at least one of the new directors referenced in paragraph B.1.a. will be appointed to the Audit Committee.

c. <u>Creation of Regulatory Compliance Committee</u>. No later than the Governance Implementation Date, the Board of Directors shall establish a new standing committee that shall consist of the two new directors and three existing independent directors, the "Regulatory Compliance Committee". The responsibilities of the Regulatory Compliance Committee shall include monitoring and reporting to the Board of Directors regarding the Parent Company and its subsidiaries' compliance with applicable laws concerning market conduct, Title 1 of ERISA, and the UnumProvident Companies' compliance with the Plan, along with such other matters as may be authorized or delegated by the Board of Directors to assist the Board in the discharge of its fiduciary duties and responsibilities.

d. <u>Creation of Regulatory Compliance Unit</u>. No later than the Implementation Date, the Parent Company shall form a new Regulatory Compliance Unit of officers or employees of the Parent Company or its subsidiaries who shall not be members of the Claim Reassessment Unit discussed below. The Regulatory Compliance Unit shall report directly to the Regulatory Compliance Committee (or to the Board of Directors until such Committee is appointed) with respect to all market-conduct matters and ERISA requirements. The responsibilities of the Regulatory Compliance Unit shall include (i) monitoring compliance with applicable laws concerning market conduct and ERISA requirements, (ii) monitoring compliance with the Plan (including the functions of the Claim Reassessment Unit) through the performance of periodic audits, (iii) providing assistance to claimants upon request that will ease and facilitate the claim submission process, and (iv) gathering data to facilitate the Lead Regulators' and the DOL's ongoing monitoring of the UnumProvident Companies' compliance with the Plan. The Regulatory Compliance Unit shall be managed by an officer who is an experienced insurance professional, whose experience includes compliance related matters. Employees of the Parent Company and all of its subsidiaries shall be provided with a toll free hotline number to confidentially report concerns respecting claim handling, such reports to be provided to the manager of the Regulatory Compliance Unit. Claimants shall be provided with a toll free hotline number for assistance throughout the claim handling process, the performance of which will be monitored by the Regulatory Compliance Unit. A log of all telephone calls to both hotline numbers shall be maintained, and quarterly reports concerning such logs shall be provided to the Regulatory Compliance Committee.

e. <u>Quarterly Board Committee and Management Meetings with Lead Regulators and the DOL</u>. During each calendar quarter beginning with the regular quarterly meeting of the Board of Directors following the Governance Implementation Date, the Regulatory Compliance Committee and the management of the UnumProvident Companies shall each meet separately with the Lead Regulators to evaluate compliance with the Plan. The DOL shall receive notice of these quarterly meetings and may attend as it deems appropriate. The Lead Regulators shall update Participating Regulators concerning these meetings through the NAIC on a quarterly basis.

2. Claim Reassessment Process

a. <u>Formation of Claim Reassessment Unit</u>. Thirty (30) days after approval of this Agreement by the Company , the Lead Regulators and the DOL, and approval of substantially

identical agreements between Unum, Revere and Provident with their respective Lead Regulators by no less than two-thirds of the Participating States in the Multistate Examination, unless a lesser number is agreed to by the UnumProvident Companies (the "Implementation Date"), the UnumProvident Companies shall form a claim reassessment unit staffed with experienced claim representatives to handle further review of previously denied or terminated individual and group long term disability claims that are resubmitted under this paragraph (the "Claim Reassessment Unit"). The Claim Reassessment Unit shall be managed by an experienced claim manager and shall report to the most senior executive in charge of claim operations. The Claim Reassessment Process, unit structure and operating procedures of the Claim Reassessment Unit, developed in consultation with and approved by the Lead Regulators and the DOL, are described in Exhibit 1 attached hereto. Staffing of the Claim Reassessment Unit shall be adjusted appropriately from time to time so that claim decisions are made in a timely manner in accordance with the operating procedures set forth in Exhibit 1.

  b. <u>Implementation of Claim Reassessment Process</u>. Beginning earlier and ending no later than the fifteenth business day following the Implementation Date, the UnumProvident Companies shall mail a notice (in the form Attachment A-1 to Exhibit 1) to all of the Specified Claimants advising that they may resubmit their claim for further review by the Claim Reassessment Unit established for that purpose. "Specified Claimant" means any claimant of one of the UnumProvident Companies, who presented a claim for group or individual long term disability benefits, and whose claim was denied or whose benefits were terminated on or after January 1, 2000 and prior to the Implementation Date for reasons other than the following: (i) death of the claimant, (ii) claim was withdrawn, (iii) claimant did not satisfy the elimination period, or (iv) maximum benefits were paid, and also excludes (x) a claimant who had his or her claim resolved through litigation or settlement, or (y) a claimant who has pending litigation against the UnumProvident Companies challenging the denial or termination of his or her claim, which lawsuit was filed after the date of receipt of notice of the Claim Reassessment Process or a claimant whose lawsuit was filed prior to the date of receipt of notice of the Claim Reassessment Process in which lawsuit there has been a verdict or judgement on the merits prior to completion of the reassessment on the claim. Specified Claimants whose claims were denied or benefits terminated due to a return to work shall receive a special notice in the form of Exhibit 1, Attachment A-2 . The Claim Reassessment Process will be available to:

  1. Any of the Specified Claimants who elect to participate within the time period set forth in Exhibit 1; and

  2. Any other group or individual long term disability claimant of one of the UnumProvident Companies whose claim was denied or whose benefits were terminated prior to January 1, 2000 and who requests participation in the Claim Reassessment Process, provided that any such denial or termination of benefits took place no earlier than January 1, 1997 and the claimant would otherwise be included with the definition of "Specified Claimant" except for the application of the January 1, 2000 date; and

  3. Any other group or individual long term disability claimant of one of the UnumProvident Companies whose claim was denied or whose benefits were terminated on or after January 1, 1997 and prior to the Implementation Date, who disputes the UnumProvident Companies' characterization on any rational basis that such denial or termination falls into any of the reasons outlined in (i) – (iv) of the definition of "Specified Claimant" and who requests to participate in the Claim Reassessment Process.

Any claimant who requests to participate pursuant to subparagraphs 2. or 3. above shall be referred to herein as a "Requesting Claimant". The initial notice will inform each Specified Claimant (i) how to communicate to the UnumProvident Companies his or her election to participate and the time period in which to respond, (ii) that he or she will be sent an acknowledgement of their election to participate, (iii) that the Claim Reassessment Process will review claims based on the original dates of their closure or denial with the oldest claims being reviewed first, (iv) that after electing to participate, a subsequent notice (Attachment B to Exhibit 1) will be sent at a time that is closer to the period when his or her claim will be reviewed indicating the approximate time period of that review and seeking information on a Reassessment Information Form (Attachment C to Exhibit 1) to support the claim reassessment, and (v) that receipt of a completed Reassessment Information Form will be acknowledged, and (vi) that by electing to have his or her claim reassessed, the claimant conditionally agrees to forego the pursuit of a legal action as specified in paragraph B.2.d. The phased approach to review and follow up notices are intended to provide Specified Claimants and Requesting Claimants who elect to have their claim reviewed a better indication of the timing of that review and when to expect a decision. In conducting all reviews, including but not limited to reviews conducted pursuant to the Claim Reassessment Process, the UnumProvident Companies must give significant weight to evidence of an award of Social Security disability benefits as supporting a finding of disability, unless the UnumProvident Companies have compelling evidence that the decision of the Social Security Administration was (i) founded on an error of law or an abuse of discretion, (ii) inconsistent with the applicable medical evidence, or (iii) inconsistent with the definition of disability contained in the applicable insurance policy. The UnumProvident Companies shall maintain their records so that the filing and results of the Claim Reassessment Process may be tracked on a state-by-state basis as well as on a group basis.

4. The UnumProvident Companies commit to use their best efforts to complete the Claim Reassessment Process by December 31, 2006, although, for good cause shown, the Lead Regulators and the DOL may agree to extend the time for completing that process.

c. Monitoring of Claim Reassessment Process. The Regulatory Compliance Unit shall conduct or cause to be conducted ongoing audits of the Claim Reassessment Process and report its findings to the Regulatory Compliance Committee, the Lead Regulators, the DOL and senior management at least quarterly. The Lead Regulators shall monitor the Claim Reassessment Process and shall conduct examinations of the Claim Reassessment Unit decisions in the manner and at such intervals as they deem appropriate. The DOL may monitor the Claim Reassessment Process and conduct examinations of the Claim Reassessment Unit as it deems appropriate. The results of the internal audits directed by the Regulatory Compliance Unit and the reviews of claim reassessment decisions directed by the Lead Regulators will be reviewed at the quarterly meetings contemplated by paragraph B.1.e. above in order to specifically evaluate the ongoing performance of the Claim Reassessment Process. Any cases reported by the Regulatory Compliance Unit or by the Lead Regulators at the quarterly meetings that have not resolved an identified potential error or claim handling practice that is non-compliant will be promptly addressed by further review of the Claim Reassessment Unit and reported on at the next quarterly meeting. The Lead Regulators shall meet quarterly with the Regulatory Compliance Committee and senior management of the Companies to review the status of the Claim Reassessment Process. The DOL shall receive notice of these meetings and may attend as it deems appropriate.

d. Effect on Litigation. This Agreement neither imposes any obligations upon, nor takes away any rights of, any claimant who chooses not to resubmit for reassessment his or her previously denied or terminated claim for benefits. Rather, the purpose of the Claim Reassessment Process provided for under this Agreement is to offer an entirely optional method for claimants

who wish to have their claims reassessed under these procedures. If a claimant does decide to resubmit his or her claim for reassessment, however, then the UnumProvident Companies may require such claimant to agree that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, then such claimant shall not pursue any legal action to the extent (and only to the extent) such action is based on any aspect of the prior denial or termination that is reversed or changed. If the UnumProvident Companies do so require, then any applicable statutes of limitations shall be tolled during the pendency of the Claim Reassessment Process. A copy of this Agreement shall be the only evidence required of such tolling. If a claimant has pending litigation against the UnumProvident Companies, is eligible under this Agreement to participate in the Claim Reassessment Process and decides to resubmit his or her claim for reassessment, then the UnumProvident Companies may require the claimant to (i) take such action as is necessary to stay such litigation pending the Claim Reassessment Process, if the court will agree to such a stay, and (ii) agree that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, then such claimant shall withdraw any litigated claim, including any extra-contractual claims, to the extent (and only to the extent) such claims are based on any aspect of the prior denial or termination that is reversed or changed. That is, to the extent that following the reassessment there remains a complete or partial denial of benefits, a claimant's right to initiate or continue litigation regarding that portion of the prior denial that has not been reversed or changed shall not be waived. As to any such claimant in whose litigation a final verdict or judgement is entered prior to completion of the claimant's reassessment, the UnumProvident Companies' obligation to conduct and/or complete the Claim Reassessment Process pursuant to this Agreement shall cease.

### 3. Changes in Claim Organization and Procedures

a. Changes in Claim Organization. The UnumProvident Companies' claim organization shall include the following ongoing objectives:

(i) Engagement of experienced claim personnel at the earliest stage of reviewing a claim;

(ii) Increased emphasis upon claim staff accountability for compliance with the terms of insurance policies and applicable law;

(iii) Increased involvement of higher levels of management in claim denial and benefit termination decisions through approval requirements;

(iv) Creation of a separate compliance-accountability function at the claim denial and benefit termination level focusing on compliance, documentation, accountability for compliance, whether the claimant has been treated fairly under the circumstances, and any action that may be construed as an instance of an improper claim practice.

No later than the Implementation Date, the UnumProvident Companies shall implement changes to their claim organization consistent with the foregoing objectives and developed in consultation with the Lead Regulators and the DOL as described in Exhibits 2 and 3 hereof.

b. Communications with Appeals Personnel. UnumProvident Companies personnel (including but not limited to claims handling personnel) shall not interfere with nor attempt in any way to influence other UnumProvident Companies personnel involved with the separate appeal process following denial of benefits or termination of any claim.

c. <u>Changes in Claim Procedures</u>. The UnumProvident Companies' claim procedures shall include the following ongoing objectives:

(i) Increased focus on policies and procedures relating to medical and related evidence, including       but not limited to the following:

- Obtaining complete medical records needed for the decision;
- Appropriate use and consideration of in-house medical resources;
- Contacting an Attending Physician ("AP") where circumstances warrant and fairly interpreting or applying information from the claimant's AP;
- Obtaining a field visit where circumstances warrant;
- Conducting an occupational review, as appropriate;
- Obtaining an Independent Medical Evaluation ("IME") or Functional Capacity Evaluation ("FCE") in appropriate circumstances and fairly interpreting or applying the IME or FCE , without any attempt to influence the impairment determinations of professionals conducting the IME and/or FCE;

(ii) Clear and express notice to claimants of the information to be provided by the claimants and       the information to be collected by the UnumProvident Companies. If a file is determined to lack       specific information, UnumProvident Companies personnel will work with claimant to obtain such       information in accordance with appropriate procedures established for such purposes.

No later than the Implementation Date, the UnumProvident Companies shall implement changed claim procedures consistent with the foregoing objectives developed in consultation with the Lead Regulators and the DOL as described in Exhibits 4, 5, 6, and 7 hereto.

d. <u>Selection of Evaluation Personnel</u>. The UnumProvident Companies shall select individuals to conduct IMEs or FCEs solely on the basis of objective, professional criteria, and without regard to results of previous IMEs or FCEs conducted by such individuals.

e. <u>Professional Certification</u>. Each clinical, vocational and medical professional employed by the UnumProvident Companies must execute the "Statement Regarding Professional Conduct" found at Exhibit 5, which includes a commitment to provide fair and reasonable evaluations considering all available medical, clinical, and/or vocational evidence, both objective and subjective, bearing on impairment. In addition, for each determination as to a claimant's impairment(s), each clinical, vocational and medical professional who makes a determination as to claimant impairments must certify that he or she has reviewed all medical, clinical and vocational evidence provided to that professional by UnumProvident Companies personnel bearing on the impairment for which such professional is trained prior to making a determination as to such impairments.

f. <u>Providing Medical, Clinical and/or Vocational Evidence</u>. Claim personnel, in soliciting evaluations of claimant impairment by clinical, vocational and medical professionals (employed by the UnumProvident Companies or otherwise), shall provide to such professionals all available medical, clinical and/or vocational evidence in the claim file, both objective and subjective, concerning impairment.

g. <u>Claims involving co-morbid conditions</u>. (i) When multiple conditions or co-morbid conditions are present, UnumProvident Companies personnel will ensure that all diagnoses and

impairments are considered and afforded appropriate weight in developing a coherent view of the claimant's medical condition, capacity and restrictions/limitations. (ii) No later than the Implementation Date, the UnumProvident Companies will implement improved procedures for evaluating claims which involve multiple or co-morbid conditions in accordance with Exhibit 4 hereto and subparagraph (i) above.

h. Training. No later than March 1, 2005, substantially all employees in the UnumProvident Companies' claim operations shall be provided appropriate training designed to educate them on the responsibilities arising from the changes in claim procedures included in paragraph B.3 of this Agreement with emphasis on concerns raised in the Multistate Examination and the corrective measures set forth in the Plan. This training will include specific instruction on the following: (i) UnumProvident Companies personnel should recognize the special function that medical professionals perform in assessing medical information concerning claimants and should not attempt to influence an in-house physician or an IME or FCE in connection with such professional's opinion concerning the medical evidence or medical condition relating to a claimant, and (ii) UnumProvident Companies personnel in claim handling positions will be evaluated and will be eligible for incentive compensation only on the basis of the quality of performance in the position each holds, and the outcome of any claim decision or any number of claim decisions is not permitted as a part of this evaluation or award of incentive compensation. The UnumProvident Companies hereby confirm that they shall not measure the performance of claim personnel or otherwise incentivize their performance, or deny or close specific claims based on claim denial or closure targets. Not later than March 1, 2005, all group policyholder human resources staff shall be offered appropriate training alternatives designed to help them support employee-claimants in making claims.

i. Monitoring of Compliance with Revised Claim Procedures. The Lead Regulators shall monitor compliance with the changes in claim procedures set forth in paragraphs B.3.b. through B.3.g. above and may conduct examinations of claims in the manner and at such intervals as the Lead Regulators deem appropriate. The DOL may monitor compliance with changes in claim procedures set forth in paragraphs B.3.b. through B.3.g above and may conduct examinations of claims in the manner and at such intervals as the DOL deems appropriate. The examinations of claims will include but not be limited to review of claim files for the following problems, including failure to:

- Conduct a field visit where circumstances warrant;
- Obtain complete medical records;
- Fairly interpret or apply information from the claimant's AP;
- Use appropriate in-house medical resources;
- Fairly interpret or apply in-house medical opinions;
- Contact AP where circumstances warrant;
- Conduct appropriate occupational review;
- Obtain an IME or FCE where circumstances warrant;
- Select individuals to conduct IMEs and FCEs solely on the basis of objective, professional criteria, and without regard to results of previous IMEs or FCEs;
- Fairly interpret or apply IME or FCE results;
- Appropriately classify disabilities under the mental and nervous limitation provisions of its policies; or
- Follow UnumProvident Companies claim procedures or other UnumProvident Companies procedures.

Claim files will also be examined for evidence of:

- Reliance on lack of "objective" data or "objective" medical information as a basis for claim denial or termination of benefits;
- Faulty or overly restrictive interpretation or application of policy provisions, including the definition of "occupation" in "own occupation" policies;
- Actions suggesting a pre-disposition or bias against the claimant;
- Threats to seek repayment of past benefits;
- Forcing claimants to seek legal counsel to obtain benefits; or
- Evidence of any incentives provided to deny or terminate benefits.

j. Standard for Compliance. The UnumProvident Companies shall be deemed in compliance with the Handbook's maximum tolerance standard for claim procedures (presently 7%) unless the collective number of claim files with errors for the Company and its affiliated companies executing substantially similar agreements as of this date (the "Group") results in an error rate that exceeds such maximum tolerance standard. Such error rate(s) shall be determined by the Lead Regulators' review of separate statistically credible random samples of the total files for the Group's long term *group* and *individual* disability income insurance claims denied or benefits terminated on or after the Implementation Date, in accordance with paragraph B.3.i above. Separate Group error rates shall be determined for the Group's long term: (i) group disability income claims; and, (ii) individual disability income claims.

k. Opportunity for Review and Comment. The UnumProvident Companies shall be entitled to review and comment on any such examination results in accordance with the provisions of the Handbook.

l. Claim Files. A claim file shall include all documents relating to a claim history and/or decision, including but not limited to correspondence, medical records, vocational records, forms, internal memoranda and internal communications (including e-mail communications), which shall be maintained in the claim file either in a paper file, or in electronic form in the case of the UnumProvident Companies' offices which operate in a "paperless" environment. The Lead Regulators and the DOL shall have access to all such paper or electronic files at all times. All claims reassessments pursuant to Paragraph B.2. and all new claim reviews pursuant to Paragraph B.3. shall be based upon a review of the entire claim file.

## C. Other Provisions

1. This Agreement shall be governed by and interpreted according to laws of the State of New York, excluding its conflict of laws provisions, and any applicable federal laws.

2. The Lead Regulators will monitor the Company's compliance with this Agreement. The DOL may also monitor the Company's compliance with this Agreement. It is further expected that the Lead Regulators will conduct a full re-examination of the issues addressed by the Multistate Examination (including the claims of the Company) within twenty-four months after the Implementation Date and make all reasonable efforts to complete such re-examination within six months of its commencement. The DOL also reserves the right to conduct further investigation as it deems appropriate.

3. The reasonable costs of the Lead Regulators in monitoring the Company's compliance with this Agreement, including the cost of conducting any reviews or examinations provided for by

the Agreement, shall be paid by the Company.

4. Within ninety (90) days of the Implementation Date, the Company will send a letter to the Plan Administrator of each ERISA-covered plan as to which the Company provided group long term disability insurance coverage between January 1, 1997 and December 31, 1999, indicating that the Agreement is available on the Parent Company's website and making particular reference to Section B.2.b.

5. Time is of the essence in implementing the provisions of this Agreement, and the times specified may only be extended for good cause and with the advance written consent of the Lead Regulators, but such consent of the Lead Regulators shall not be unreasonably withheld.

6. A decision by the Lead Regulator in this Agreement means a decision that has been agreed to by all four of the Lead Regulators under this Agreement and substantially identical agreements referred to in the Recitals.

7. This Agreement shall remain in effect until the later of (i) January 1, 2007; (ii) the substantial completion of review by the Claim Reassessment Unit of claims for which review has been requested by Specified Claimants and Requesting Claimants and information needed for the review has been submitted on a timely basis; or (iii) the completion of the full re-examination referenced in paragraph C.2. Except as set forth in paragraph C.8 below, this Agreement and its provisions terminate for all purposes pursuant to this paragraph C.7.

8. Notwithstanding the termination of this Agreement to the extent provided in accordance with paragraph C.7 above:

(i) This Agreement shall survive as to the following provisions, which also individually survive: paragraphs -- B.2.b.3 (insofar as it relates to the consideration to be given Social Security disability awards); B.3.a (insofar as it establishes objectives for the Company's claim organization); B.3.b; B.3.c. (insofar as it establishes objectives for the Company's claim procedures); B.3.d; B.3.e; B.3.f; B.3.g. (insofar as it establishes objectives regarding evaluation of claims with co-morbid conditions); B.3.h (insofar as it confirms that claim personnel performance shall not be measured based on claim denial or termination targets or that claims will be closed based on termination or denial targets); B.3.l (insofar as it describes the content of a claim file).

(ii) The foregoing surviving obligations of the Company may only be amended by obtaining the consent of the Lead Regulators (acting in accordance with paragraph C.6) and the DOL, to any such amended provision: and,

(iii) Following termination of this Agreement for purposes of paragraph C.7 above, the Company will not materially change the claim procedures described in Exhibits 4, 5, 6 and 7 hereto unless (1) it first notifies the Lead Regulators and the DOL thirty days in advance of the proposed change and (2) the Lead Regulators and the DOL, within ten days of receipt of such notice, do not reasonably object.

9. Neither this Agreement nor any related negotiations, statements or court proceedings shall be offered by the Company, the Lead Regulator or the DOL as evidence of or an admission, denial or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including but not limited to the Company, the UnumProvident Companies or the Parent Company, or as a waiver by the Company, the UnumProvident Companies or the Parent Company of any

applicable defense, including without limitation any applicable statute of limitations or statute of frauds, except as set forth in B.2.d. of this Agreement.

10. The Company does not admit, deny or concede any actual or potential fault, wrongdoing or liability in connection with any facts or claims that have been or could have been alleged against it, but considers it desirable for this matter to be resolved because this Agreement will provide substantial benefits to the Company's present and former policyholders and insureds.

11. Neither this Agreement nor any of the relief to be offered under this Agreement shall be interpreted to alter in any way the contractual terms of any policy, or to constitute a novation of any policy. Neither this Agreement nor any relief to be offered under this Agreement shall be interpreted to reduce or increase any rights of participants in ERISA-covered plans, including but not limited to rights to which they may be entitled pursuant to ERISA 29 U.S.C. 1133, and 29 C.F.R. 2560.503-1, including any appeal or review rights under the plan. Other than those rights afforded under this Agreement, no additional rights are provided to the extent that any Specified Claimants or Requesting Claimants have previously exercised their rights as mentioned in this paragraph 11 (or have failed to exercise their rights and therefore, as provided for under ERISA, have permitted those rights to lapse).

12. The effectiveness of this Agreement is conditioned upon the following: (i) approval and execution of the Agreement by the Company, the Lead Regulators and the DOL, (ii) approval and execution of substantially identical regulatory settlement agreements between each of the other four insurance companies that come within the definition of UnumProvident Companies and their respective domiciliary regulators, and (iii) approval and execution of the substantially identical agreements referenced above by appropriate documentation of no less than two-thirds of the Participating States in the Multistate Examination, unless a lesser number is agreed by the UnumProvident Companies, and .

13. This Agreement (or its Exhibits and their Attachments) may be amended by the Lead Regulators, the DOL and the Company. All such amendments to this Agreement shall be in writing.

14. The DOL may enter into arrangements or agreements with any of the Lead Regulators pursuant to Section 506 of ERISA, 29 U.S.C. Section 1136, for cooperation, mutual assistance, or use by the DOL of facilities or services in connection with monitoring compliance with the Agreement and Title 1 of ERISA (including 29 C.F.R. Section 2560.503-1) and receiving reports on activities undertaken in connection with this Agreement. To the extent the Secretary enters into such an arrangement or agreement with any of the Lead Regulators, the Company shall provide reimbursement for any expenses incurred pursuant to C.3 of this Agreement.

15. For the duration of this Agreement, if any Lead Regulator finds any information which it believes constitutes a violation of ERISA with respect to any employee benefit plan, such regulator shall report that information to the DOL as soon as practicable.

## D. Remedies

1. In the event that the Group fails to implement all of the changes in corporate governance provided for in paragraph B.1. of this Agreement within the times specified in that paragraph, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured; provided, however, the Group will not be deemed to be non-compliant with the time requirements of

paragraph B.1. if the Lead Regulators have not approved both of the candidates proposed by the Board of Directors to become new directors.

2. In the event that the Group fails to implement the Claim Reassessment Process provided for in paragraph B.2. of this Agreement within the times specified in that paragraph, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

3. In the event that the Group fails to provide the initial notice to Specified Claimants within the period set forth in Exhibit 1, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

4. In the event that the Group fails to implement the changes to the claim organization or the changes to the claim procedures provided for in paragraph B.3.a., paragraph B.3.c. or paragraph B.3.g. within the times specified therein, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

5. In the event that the Group fails to conduct the training provided for in paragraph B.3.h. within the time specified therein, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

6. Upon material completion of the Claim Reassessment Process, should the Lead Regulators upon examination determine that claim reassessment decisions were made in a manner inconsistent with the procedures of the Claim Reassessment Unit, the Group shall pay a fine of $145,000,000. The Group shall be deemed in compliance with the Handbook's maximum tolerance standard for claim procedures (presently 7%) unless the number of claim files with errors results in an error rate for either their collective subject *group* or *individual* claims hereunder that exceeds such maximum tolerance standard. Such error rates shall be determined by the Lead Regulators based on a review of statistically credible random separate samples of each of the *group* and *individual* claim reassessment decisions for the Group. A total fine of $145,000,000 shall be payable under this paragraph and/or paragraph D.7, but not both, in the event that the error rate exceeds the maximum tolerance standard for either or both of the *group* and/or *individual* claim samples. The Lead Regulators will use their best efforts to complete this determination by July 1, 2007.

7. Upon completion of the examination described in paragraph C.2, should the Lead Regulators determine that claims denied or benefits terminated after the Implementation Date did not meet the standard for compliance set forth in paragraph B.3.j, the Group shall pay a fine of $145,000,000. Such error rates shall be determined by the Lead Regulators based on review of a statistically credible random separate sample of each of the *group* and *individual* subject claims denied or benefits terminated after the Implementation Date. A total fine of $145,000,000 shall be payable under this paragraph and/or paragraph D.6, but not both, in the event that the number of claim files with errors results in an error rate that exceeds the maximum tolerance standard for either or both of the *group* and/or *individual* claim samples. The Lead Regulators will use their best efforts to complete this examination by July 1, 2007.

8. The purpose of any fines imposed pursuant to paragraphs D.1 through D.5 is to encourage timely implementation of the matter set forth in each paragraph.

9. Within fifteen (15) days of being advised in writing by the Lead Regulators that the required two-thirds of Participating States have approved and consented to the substantially

identical agreements referenced in paragraph A.4. (unless the UnumProvident Companies consent to a lower number) and the other conditions of effectiveness set forth in paragraph C.12 having been satisfied, the Group shall pay to the Lead Regulators a fine of $15,000,000.

10. In addition to the other penalties applicable pursuant to this Agreement, and notwithstanding the error rate threshold, the Lead Regulator retains the right to impose any regulatory penalty otherwise available by law, including fines, with respect to the Company's willful violation of the terms of this Agreement or other violation of law.

11. The obligation, as among each member of the Group, to pay any such fines shall be equal to the proportional capital and surplus of each member to the Group's obligation, such calculation to be based on the most recently filed NAIC financial statement of each such member.

12. All fines paid under the foregoing subparagraphs shall be paid to the Lead Regulators and then allocated among the Lead Regulators and all Participating Regulators on the basis of the UnumProvident Companies' premium volume for in-force policies of individual and group disability insurance as of December 31, 2003.

13. The Lead Regulators and the DOL reserve the right to pursue any other remedy or remedies for violations of this Agreement. Nothing in this Agreement shall be construed to waive or limit the rights of the Lead Regulators and the DOL to seek such other and additional remedies.

14. The enforcement of any fine imposed hereunder and the findings upon which any such fine are based shall be subject to judicial review as otherwise provided by law.

FIRST UNUM LIFE INSURANCE COMPANY

BY:_____

ITS:_____

November ___, 2004

TENNESSEE DEPARTMENT OF COMMERCE
AND INSURANCE

BY:_____
       Paula A. Flowers, Commissioner

       November ___, 2004

MAINE BUREAU OF INSURANCE          NEW YORK SUPERINTENDENT
                                   OF INSURANCE

BY:_____    BY:_____
Alessandro A. Iuppa, Superintendent        Gregory Serio, Superintendent

November __, 2004                November __, 2004

MASSACHUSETTS DIVISION OF INSURANCE

BY:_____
Julianne M. Bowler, Commissioner

November __, 2004


ELAINE L. CHAO
SECRETARY OF LABOR

ANN L. COOMBS
ASSISTANT SECRETARY
EMPLOYEE BENEFITS SECURITY ADMINISTRATION

BY:_____
James M. Benages
Regional Director
Employee Benefits Security Administration

November __, 2004


Post Office Address:

U.S. Department of Labor
Employee Benefits Security Administration
JFK Federal Building, Room 575
Boston, MA 02203
TEL:(617)565-9600
FAX:(617)565-9666

Last Updated: **November 17, 2004**

# HIGHLAND
## MEDICAL CENTER

U. PRAKASH RAU, MD, FACG
PEPPINO BUTERA, MD
REBECCA BROWN, PA

M. ELGEZIRY, MD
NAHID KENNEDY, DO
DEVINDER SINGH, MD

March 28, 2006

RE: JoAnne Royer
DOB- 5/5/53

To Whom It May Concern,

Please be advised that I have been the primary care physician for Ms Royer for the last 8 years. Since January 2003, I have been treating her for a recurrence of a lumbar problem.

Dr Michael DiTullio was her neurosurgeon and performed her second spinal surgery on January 13, 2003.

Ms. Royer had a previous back surgery for disc herniation. Ms Royer continues to suffer with severe pain and spasms in spite of multiple epidural injections at the pain clinic. Ms Royer has also had multiple consults with other neurosurgeons and has tried numerous types of physical therapy without any success. Ms Royer is currently being evaluated at the pain clinic for nerve blocks.

Due to the severity of Ms Royer's condition, she is unable to sit, stand or walk for any length of time, rendering her mobility severely limited and impaired.

It is my opinion that since January, 2003 to present and at least for the immediate future, Ms Royer has been and continues to be and is likely to remain totally disabled from working.

Should you have any further questions regarding this patient, please do not hesitate to contact me at 781-848-6040.

Sincerely,

M. Elgeziry, MD

**"B"**

1681 Washington Street, Braintree, MA 02184 • 42 Tremont Street, Duxbury, MA 02331 • 243 Church Street, Pembroke, MA 02359